# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| CLAUDETTE E. KATZENMEIER,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | Case No. 19-CV-4076-KEM<br><br>**MEMORANDUM OPINION AND ORDER** |

_____

Plaintiff Claudette E. Katzenmeier seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Katzenmeier argues that the administrative law judge (ALJ) erred by failing to include greater limitations in concentration based on the medical-opinion evidence and the ALJ's step-three findings, by discounting the opinion of the disability coordinator at Katzenmeier's prior job, by failing to develop the record on Katzenmeier's vision limitations, and by discounting Katzenmeier's subjective complaints related to her inability to frequently handle and finger. Katzenmeier also raises (for the first time) an Appointments Clause challenge in reliance on *Lucia v. SEC*, 138 S. Ct. 2044 (2018). Because substantial evidence does not support the ALJ's determination that Katzenmeier could frequently handle and finger, I **reverse** the Commissioner's decision and remand for further proceedings.

## I. BACKGROUND[1]

Katzenmeier taught at a high school from 2006 to 2011, and she began working as an adjunct professor at a community college in August 2011. AR 41, 233.[2] As early as November 2014, she began mental-health treatment with psychiatric nurse practitioner Glenda Denherder (NP Denherder) and psychologist Brenda Crawford, PhD, for diagnoses that included depression, anxiety, and attention deficit hyperactivity disorder (ADHD). *See* AR 455-479, 619-33. In August 2015, she also began seeking treatment for various physical ailments, including hand pain. *See* AR 518, 528. She continued teaching, although in the fall of 2015, she was given a stool as an accommodation, since she could no longer stand for an entire class. AR 44; *see also* AR 619 (took summer 2015 off teaching). As the fall 2015 semester went on, she struggled with concentration and using her hands to type, and as a result, in November 2015, the community college combined her two classes into one. AR 44-45, 220, 329-30, 616. At this point, the amount Katzenmeier earned from teaching did not amount to substantial gainful activity, and her husband urged her to apply for disability benefits because of her pain. AR 12, 445.

After some debate, Katzenmeier ultimately decided to continue working in the spring and summer of 2016, teaching just one online class. *See* AR 220, 432, 444-45, 610. Her mother died in late July 2016, exacerbating Katzenmeier's mental-health symptoms, and she applied for disability shortly thereafter. *See* AR 10, 708. At NP Denherder's advice, she took the fall 2016 semester off to grieve and focus on self-care, and she never returned to teaching at the community college. AR 42, 428, 708. Katzenmeier has worked occasionally as a substitute teacher, however, after filing for disability. *See* AR 41, 900-02.

---

[1] For a more thorough overview, see the Joint Statement of Facts, filed at Doc. 10.
[2] "AR" refers to the administrative record below, filed at Docs. 7-2 to 7-11.

After filing for disability, Katzenmeier had her first appointment with rheumatologist Robert Wisco, MD, in October 2016. AR 694. After several appointments throughout late 2016, 2017, and 2018, Dr. Wisco diagnosed Katzenmeier with fibromyalgia and psoriatic arthritis, although his treatment notes routinely suggest that fibromyalgia played a bigger role in Katzenmeier's symptoms than arthritis. *See, e.g.*, AR 968.

The Social Security Administration denied Katzenmeier's disability application on initial review in October 2016 and again on reconsideration in March 2017. AR 69-106. Katzenmeier requested review before an ALJ, and the ALJ held a hearing by video on September 6, 2018. AR 10. On January 7, 2019, the ALJ issued a written opinion, following the five-step process outlined in the regulations.[3] AR 10-23. The ALJ found Katzenmeier suffered from the following severe impairments: depression, anxiety, ADHD, obesity, sleep apnea, psoriatic arthritis, left thumb pain, interstitial cystitis, fibromyalgia, and regional pain syndrome. AR 13. At step three, the ALJ found Katzenmeier's impairments did not meet or equal a listing, finding as part of that analysis that Katzenmeier suffered from moderate limitations in concentration, persistence, or pace. AR 14-16. For purposes of determining Katzenmeier's ability to perform her past work (at step four) and other work (at step five), the ALJ determined Katzenmeier's residual functional capacity (RFC):[4]

---

[3] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." ***King v. Astrue***, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quoting ***Eichelberger v. Barnhart***, 390 F.3d 584, 591 (8th Cir. 2004)).

[4] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019).

> [She] has the [RFC] to perform light work . . . except: She can occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. She cannot operate a motor vehicle as part of her job duties. She is able to understand, remember, and carry out simple and detailed instructions that can be learned in six months or less. She can sustain concentration and persist at simple and detailed tasks for two hours at a time with normal breaks for eight hours. She can only occasionally interact with the general public. She can only frequently handle and finger with the upper extremities.

AR 16. Based on her RFC, age, education, and work experience, the ALJ found that although Katzenmeier could not perform her past work, other jobs existed in significant numbers in the national economy she could perform, including mail clerk, office helper, and flagger. AR 21-23. Thus, the ALJ found Katzenmeier not disabled. AR 23.

Katzenmeier appealed the ALJ's decision to the Appeals Council. The Appeals Council denied review on August 30, 2019 (AR 1-3), making the ALJ's decision that Katzenmeier was not disabled the final decision of the Commissioner. *See* **20 C.F.R. § 404.981**. Katzenmeier filed a timely complaint in this court (Doc. 1). *See* **20 C.F.R. § 422.210(c)**. The parties consented to the jurisdiction of a United States magistrate judge. Doc. 9.

After the parties briefed the issues (Docs. 10-13), Katzenmeier moved to remand based on new evidence (Docs. 16, 17). Katzenmeier had re-applied for DI benefits on January 20, 2020, alleging the same onset date in November 2015. *See* Doc. 17-1. In March 2020, the Social Security Administration awarded Katzenmeier disability benefits on initial review, adjusting her alleged onset date to one day after the issuance of the ALJ's decision due to principles of res judicata. *Id.* Katzenmeier argues that this new award of benefits constitutes new evidence. She also argues that an opinion submitted by Dr. Crawford in support of this disability application constitutes new evidence. The Commissioner resists Katzenmeier's motion. Doc. 18.

4

## II. INITIAL BRIEFS

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." ***Kirby***, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

Katzenmeier challenges the ALJ's mental RFC determination on several bases, arguing that substantial evidence does not support the ALJ's finding that Katzenmeier can perform semiskilled work and that the ALJ did not give a good reason for discounting an opinion from Katzenmeier's former boss. Katzenmeier also argues that the ALJ should have included physical RFC limitations related to her vision or otherwise developed the record on this impairment. Katzenmeier asserts that the ALJ did not give a good reason for discounting her subjective complaints, specifically with regard to her handling and fingering limitations. Finally, Katzenmeier argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution.

### A. *Semiskilled Work*

Katzenmeier argues that the ALJ's mental RFC opinion is not supported by sufficient medical evidence and that it does not reflect the ALJ's step-three findings of moderate limitations in concentration, persistence, or pace. When determining Katzenmeier's RFC, the ALJ found that she could "understand, remember, and carry out simple and detailed instructions that can be learned in six months or less." AR 16; *see also* AR 21 (characterizing RFC limitation as "semi-skilled work"). The amount of time it takes the typical worker to learn a job is called the specific vocational preparation (SVP)

5

level, and the Dictionary of Occupational Titles (DOT) lists each job's SVP level. **DOT, App. C**. Jobs with an SVP level of 1 or 2 require a "short demonstration" or up to one month to learn (called "unskilled work");[5] jobs with an SVP level of 3 take one to three months to learn; and jobs with an SVP level of 4 take three to six months to learn. *Id.* Thus, by limiting Katzenmeier to a job that could be learned in six months, the ALJ limited Katzenmeier to jobs with an SVP level up to 4.

Katzenmeier argues that the ALJ's mental RFC determination limiting her to work with an SVP level of 4 is inconsistent with the medical-opinion evidence. Katzenmeier argues that the state agency psychological consultants' opinions, the only mental RFC opinions in the record, support a limitation to unskilled work, or work with an SVP level of 1 or 2. *See* AR 82-85, 102-105. The Commissioner disputes this characterization of the state agency consultants' opinions. The Commissioner further notes that the three jobs the ALJ found Katzenmeier could perform at step five all have an SVP level of 2. *See* AR 23. Thus, the Commissioner argues that any error was harmless, an argument that Katzenmeier does not address in her reply brief.

I agree with the Commissioner that because the ALJ ultimately identified unskilled jobs for Katzenmeier to perform, any error in failing to include in her RFC a limitation to unskilled work is harmless. *See **Byes v. Astrue***, 687 F.3d 913, 917 (8th Cir. 2012) (declining to reverse an ALJ's decision when "[e]ven if the ALJ had not erred, there [was] no indication that the ALJ would have decided differently"); ***Van Vickle v. Astrue***, 539 F.3d 825, 830 (8th Cir. 2008). Because limiting a claimant to jobs with an SVP level of two adequately captures an ALJ's step-three finding that a claimant is moderately limited in concentration, persistence, or pace, *see **Loeckle v. Saul**,* No. 19-CV-3031-LTS-KEM, 2020 WL 6821077, at *9 (N.D. Iowa Aug. 11, 2020), *report and recommendation adopted as modified,* 2020 WL 5518620 (Sept. 14, 2020), *appeal filed*,

---

[5] *See **Hulsey v. Astrue***, 622 F.3d 917, 923 (8th Cir. 2010); Social Security Ruling **00-4P**, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000).

6

No. 20-3373 (8th Cir. Nov. 13, 2020); Katzenmeier's assignment of error based on step three is harmless for the same reason.

### B. Weight to Opinion Evidence

Katzenmeier argues that the ALJ erred by discounting mental limitations reflected in an opinion submitted by Michelle Fiechtner, the disability coordinator at the community college where Katzenmeier used to teach. When considering the weight to assign an RFC opinion from a nonmedical source, the ALJ generally considers the same factors as with medical opinions, to the extent applicable:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. § 404.1527(c)**); *see* **20 C.F.R. § 404.1527(f)(1)**.

Fiechtner completed a "work performance assessment" form in December 2016. AR 329-30. She checked boxes indicating that Katzenmeier's abilities were poor in the following areas: concentrate and remain on task, adapt to changes in the workplace, adhere to schedules (including attendance), manage workplace stress, and manage personal stress while in the workplace. AR 329. Fiechtner explained:

> All work and duties performed were excellent until Fall of 2015. [Katzenmeier] started having health issues, which caused her work performance to decline. Proofreading and editing students['] papers are a major part of her job and this duty was [a]ffected greatly due to health issues.

*Id*. The ALJ assigned Fiechtner's opinion only "some weight," noting that her opinion was "not entirely consistent with the medical evidence and the claimant's activities of daily living" and that her "observations pertain to the claimant's functioning in a highly

7

skilled position of adjunct professor, while her [RFC] limits her to semi-skilled work with only occasional interactions with the public." AR 21.

Substantial evidence supports the ALJ's decision to assign only some weight to Fiechtner's opinion. First, as the ALJ noted, difficulties concentrating as necessary for highly skilled work—teaching college students and grading and editing papers—does not necessarily translate to an inability to concentrate when performing simpler work. Second, to the extent Fiechtner's opinion can be read as supporting that Katzenmeier cannot concentrate for even simple work, the ALJ could find this opinion inconsistent with Katzenmeier's activities of daily living and the treatment records. Although Katzenmeier's activities of daily living are limited, her limitations primarily relate to her physical condition—as the ALJ noted, she reported reading, watching television, and planning a graduation party for her daughter, and she was also able to maintain the attention needed to substitute teach (she reported pain, not concentration issues, limited her ability to substitute teach). AR 19, 832, 890, 900-01, 975, 979, 992. In addition, the mental-health treatment records primarily reflect complaints of physical pain and situational stressors such as home responsibilities and her children. Although Dr. Crawford's and NP Denherder's treatment notes reflect Katzenmeier consistently reported concentration and attention problems in the review of systems, Dr. Crawford's records show Katzenmeier made these same complaints well before her alleged onset date, as far back as November 2014, when she was not having trouble teaching. *See* AR 455-64, 466-79. The mental-health records do occasionally reflect increased trouble concentrating or paying attention (possibly due to side effects from Katzenmeier's medications, possibly due to "fibromyalgia fog"). *See* AR 610, 702, 705, 708, 800, 887, 891, 893, 908-09, 979, 983, 986, 992, 1031. Overall, however, the ALJ could find Katzenmeier's decreased concentration made it so that she lacked the mental capabilities to perform her past work as an adjunct college professor, but not that she was so limited she could not perform other, simpler work.

Substantial evidence supports the ALJ's decision to afford only some weight to Fiechtner's work performance assessment form.

### C. Vision Impairment

Katzenmeier has used a prosthetic left eye since childhood, and she suffers from a congenital cataract in her right eye. *See* AR 409, 566. At step two, the ALJ recognized that Katzenmeier "was blind in the left eye." AR 13. The ALJ found any vision impairment nonsevere, however, because Katzenmeier "had 20/25 visual acuity in the right" eye. *Id*. The ALJ concluded that her vision issues would "not cause more than a minimal limitation" in her "ability to do basic work activities" (and included no limitations related to vision in Katzenmeier's RFC). AR 13, 16.

Katzenmeier argues that the ALJ erred in failing to develop the record regarding her vision impairment. She suggests that blindness in one eye necessarily affects depth perception, near and far acuity, and field of vision, and the ALJ should have included such limitations in her RFC or otherwise developed the record regarding the effects of her vision impairment on her RFC.

Katzenmeier did not complain of any vision limitations in her testimony or function reports (other than generally noting her left-eye blindness). Treatment notes from her eye doctor reflect Katzenmeier consistently reported difficulty driving at night due to glare,[6] but she did not complain of difficulties with depth perception or the other limitations argued by her attorney. AR 403, 407, 409, 820, 822. She has suffered from left-eye blindness since her childhood, and she has been able to complete school, work, and perform activities of daily living. Under similar circumstances, courts have upheld an ALJ's failure to include blindness in one eye as a severe impairment at step two and to include vision limitations in the RFC. *See **Cummins v. Schweiker***, 670 F.2d 81, 84 (7th Cir. 1982) (holding that the ALJ did not err in relying on the grids to determine

---

[6] The ALJ's RFC includes a limitation that Katzenmeier should not have to drive. AR 16.

9

whether other work existed for the claimant to perform, even though this necessitated a finding that the claimant's blindness in one eye caused no RFC limitation, noting that the claimant's blindness had not interfered with his previous work) (favorably cited by the Eighth Circuit in *Cockerham v. Sullivan*, 895 F.2d 492, 496 (8th Cir. 1990)); ***Rector v. Colvin***, No. 4:15-CV-1394 NAB, 2016 WL 4537910, at *2-3 (E.D. Mo. Aug. 30, 2016) (affirming ALJ's failure to include right-eye blindness as severe impairment at step two, despite claimant's testimony that his depth perception was non-existent and he suffered "tunnel vision," when treatment records reflected claimant did not contend "he was unable to do any work activities due to his vision," complaining only of trouble driving due to glare; and claimant worked for many years despite vision impairment, and stopped working due to other impairments); ***Sutton v. Colvin***, No. 4:13CV1035 TIA, 2014 WL 4352045, at *11 (E.D. Mo. Sept. 2, 2014) (holding that substantial evidence supported ALJ's determination that claimant's blindness in one eye was not a severe impairment when the claimant had been blind since age 2, was able to drive a car, and had worked for several years despite the condition); ***Fraser v. Colvin***, No. CV 12-2169 (MJD/LIB), 2013 WL 4483354, at *11 (D. Minn. Aug. 19, 2013) (holding that ALJ did not err in failing to develop the record and obtain medical-opinion evidence regarding claimant's blindness in one eye when the plaintiff did not testify that his visual impairment limited his ability to work, and the only evidence of left-eye blindness was in third-party function report); ***Bradford v. Astrue***, No. 2:10 CV 15 DDN, 2011 WL 147734, at *7 (E.D. Mo. Jan. 18, 2011) (collecting cases and holding ALJ did not err in failing to include blindness in one eye as severe impairment at step two; the court noted only one mention of blindness in one eye causing any limitation—affecting depth perception—and that the claimant was able to work after the accident causing blindness and still able to drive a car); *see also* ***Banks v. Massanari***, 258 F.3d 820, 825 (8th Cir. 2001) (when the ALJ found claimant could return to her past work, affirming ALJ's failure to include any RFC limitations related to claimant's blindness in one eye, noting the claimant had "been blind since childhood and ha[d] successfully worked for years with that condition").

10

The ALJ did not err in failing to include left-eye blindness as a severe impairment at step two or in failing to further develop the record.

### D. Handling and Fingering

When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[7] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." ***Black***, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary," ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993). Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

Here, Katzenmeier testified that she stopped teaching at the community college because she became physically unable to do the job—specifically, she testified to suffering pain in her hands during flares making her unable to type. AR 44-45. Her initial disability application and Fiechtner's work assessment form further support that pain in her hands contributed to her poor work performance as an adjunct professor. AR 220,

---

[7] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

11

330. Katzenmeier's function reports and testimony all reflect that she suffers limitations due to pain in her hands. AR 44-51, 55-56, 257-58, 260, 307-08, 311. She reported having difficulty with typing, buttons, washing her hair, cleaning, and yard work, particularly during "bad days." *Id.*

In determining Katzenmeier's RFC, the ALJ found that she could "frequently handle and finger with the upper extremities." AR 16. "Frequently" is a term of art meaning from one-third to two-thirds of an eight-hour day. *See, e.g.*, **DOT, App. C**. The ALJ rejected Katzenmeier's subjective complaints that she could not use her hands frequently, concluding that "few objective findings . . . support[ed] her impairments." AR 18. But as noted, an ALJ may not discount a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). The ALJ also concluded that "the objective medical evidence is not entirely consistent with the alleged extent and severity of pain and limitations." AR 18. To the extent this can be read as a finding that Katzenmeier's complaints related to her hands were inconsistent with the treatment notes (a permissible reason to discount a claimant's subjective complaints), this conclusion is not supported by substantial evidence.

First, the ALJ pointed to normal objective examinations by Katzenmeier's primary care providers. AR 18. But these records do not reflect an in-depth examination of Katzenmeier's hands and joints; they note only that her extremities showed no cyanosis, clubbing, or edema. *See* AR 537, 558, 569, 577, 724, 762, 842, 852, 862; *see also* AR 872 (trade edema noted). As the ALJ noted, when Katzenmeier's primary care provider took more detailed notes (in November 2016), he found her left wrist showed tenderness and a reduced range of motion (but no swelling, and again no cyanosis, clubbing, or edema). AR 18, 658; *see also* AR 519 (mild edema and tenderness at right metacarpals noted in August 2015). Dr. Wisco, Katzenmeier's rheumatologist who began treating her hand pain in October 2016, consistently noted some tenderness in the fingers and wrists on objective examination, but the ability to make full fists and no joint synovitis.

12

AR 692, 696, 815, 827, 829, 831, 833, 968. Dr. Wisco concluded based on his objective examinations that much of Katzenmeier's hand pain was caused by fibromyalgia, as opposed to psoriatic arthritis. *See id.*

The ALJ noted the results of Dr. Wisco's examinations and used it as support for discrediting Katzenmeier's subjective complaints. AR 18. But with fibromyalgia pain, tenderness is often the only objective finding. *See Cline v. Colvin*, 771 F.3d 1098, 1105 (8th Cir. 2014) (Bright, J., dissenting) ("[P]hysical examinations of those with fibromyalgia 'will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.'" (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108-09 (2d Cir. 2003))); *Miller v. Colvin*, 114 F. Supp. 3d 741, 765-66 (D.S.D. 2015) (noting that "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients" and that "trigger points are the only 'objective' signs of fibromyalgia" (alteration in original) (quoting *Johnson v. Astrue*, 597 F.3d 409, 410, 412 (1st Cir. 2009))); *Fickler v. Colvin*, No. 8:11CV440, 2013 WL 1090405, at *22 (D. Neb. Mar. 15, 2013) (noting that "[l]ittle can be gleaned from the fact that [a claimant's] range of motion and other musculoskeletal and neurological examinations were essentially normal," as that is often "the case with fibromyalgia patients"). Thus, while Dr. Wisco's examinations may support that Katzenmeier's hand pain was inconsistent with psoriatic arthritis—as Dr. Wisco himself noted—they are not inconsistent with hand pain caused by fibromyalgia.

The ALJ also pointed to treatment notes from Katzenmeier's primary care providers, before she was referred to Dr. Wisco, a specialist. AR 18. In November 2015, her rheumatology work-up was normal (which has no bearing on Katzenmeier's fibromyalgia pain). AR 18. In June 2016, her primary care provider noted "she did not clearly fit into fibromyalgia," so he referred her to a specialist (Dr. Wisco, who ultimately did diagnose Katzenmeier with fibromyalgia). AR 18, 571. The ALJ also noted that in August 2016, her primary care provider noted that "[m]ultiple pain complaints with essentially negative findings suggest there is a strong emotional

component." AR 18, 578. The ALJ ignored that the treatment note went on to say that she "also likely has underlying fibromyalgia." *Id.*

The treatment records reflect that Katzenmeier fairly consistently complained of hand pain, and she received extensive treatment. The ALJ noted that in March 2016, her primary care provider noted she was "doing well on medications." AR 18, 557. But guidance from the Social Security Administration notes that "[f]or a person with [fibromyalgia]," it is especially important to "consider [the] longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" **Social Security Ruling (SSR) 12-2p, 77 Fed. Reg. 43640, 43644** (July 25, 2012).

Here, Katzenmeier first complained of hand pain in August 2015. AR 518-19. In September 2015, she again reported hand pain to her primary care provider, and in November 2015, she told NP Denherder (a mental-health professional) that she had not been able to use a keyboard as required for work (around this time, the courses she taught were reduced from two classes to one). AR 528, 610; *see also* AR 532 (October 2015: reported improved pain with Lyrica, but she "had to stop the medication due to side effects of eye twitching"). As the ALJ noted, she reported doing fairly well with medications in the spring of 2016. AR 557, 562. In June 2016, she complained of "discomfort" in the joints of her hands. AR 566. She reported a fibromyalgia flare to both her chiropractor and primary care provider in August 2016, noting she was having difficulty typing and with activities of daily living due to pain in her left hand (around this time, she stopped working completely and filed for disability). AR 573, 677, 679; *see also* AR 705 (told NP Denherder in September 2016 that pain in her left hand made it difficult to type). As a result, she was referred to Dr. Wisco. She explained at her first appointment in October 2016 that she first noticed the hand pain in September 2015, which worsened in November 2015, then improved, but she reported still suffering pain sometimes, as well as discomfort in the left wrist over the last four weeks. AR 694. Dr. Wisco did not prescribe any medications at that appointment. AR 696.

14

She next saw Dr. Wisco in December 2016. AR 691. In the interim, she called Dr. Wisco's office numerous times complaining of hand pain, and he prescribed prednisone and later, ibuprofen. *Id.* Before her December 2016 appointment with Dr. Wisco, she also complained of hand and wrist pain (including a pain flare) to her primary care provider, chiropractor, and mental health providers, and stated the pain affected her activities of daily living, including her ability to hold a steering wheel and hook her bra. AR 638-40, 653, 655, 682-85, 702. Her primary care provider administered a Kenalog injection. AR 659.

At her December 2016 appointment with Dr. Wisco, she continued to complain of hand pain, and he instructed her to take 400 milligrams of ibuprofen three times daily. AR 691. Before her next appointment in March 2016, she called Dr. Wisco numerous times complaining of hand pain, and he adjusted her medications, adding gabapentin; then discontinuing ibuprofen and adding sulindac; then increasing her gabapentin dosage, which caused side effects resulting in that medication being discontinued; and decreasing her sulindac dosage when it caused high blood pressure, only to increase it back to the original dosage when her pain worsened. AR 814; *see also* AR 728, 757 (complained of hand pain at weight-management appointments). At her appointment with Dr. Wisco in March 2017, he noted a psoriasis rash on her scalp, and he concluded that her widespread joint problems might be related to psoriatic arthritis (although he also noted that fibromyalgia also contributed to her symptoms). AR 815. He prescribed methotrexate, a chemotherapy drug (which caused some hair loss as a side effect). AR 815, 832.

At her next appointment with Dr. Wisco in May 2017, she reported severe thumb pain with forceful grasping (as she had been preparing for her daughter's high school graduation party), as well as back and other pain, but not joint pain in her hands. AR 832; *see also* AR 902-03 (psychologist's treatment records from April 2017 reflect that Katzenmeier was trying to become a substitute teacher and that although she reported constant fibromyalgia pain, the severity varied). Dr. Wisco determined her left thumb pain was likely the result of De Quervain's tenosynovitis due to a positive Finkelstein's

15

test, and he recommended she use a thumb splint when active. AR 833.

Katzenmeier had an allergic reaction to one of her medications in June 2017, and she was prescribed a course of prednisone. AR 830, 848, 864. Shortly thereafter, in July 2017, Katzenmeier's primary care provider noted her fibromyalgia was stable. AR 864. When Katzenmeier met with Dr. Wisco in August 2017, she reported that while on prednisone, her joint problems improved, but within the last week, she reported left thumb pain radiating to her arm and "discomfort" in her left third finger. AR 830. Dr. Wisco increased her dosage of methotrexate, and he encouraged her to accept an increased dosage of Cymbalta prescribed by her psychiatric care provider. AR 831.

She reported a fibromyalgia flare at a November 2017 appointment with Dr. Wisco. AR 828. She noted discomfort in her right third and fourth fingers that worsened with repetitious hand activity, such as typing. AR 828. Dr. Wisco continued her medications but substituted diclofenac for sulindac. AR 829.

Katzenmeier reported fibromyalgia pain flares to her mental-health providers in late 2017 and early 2018, and she noted she had not been able to substitute teach due to pain and exhaustion. AR 887, 889-91. She continued to report worsened pain in her hands at an appointment with Dr. Wisco in February 2018. AR 826. He noted she had tried most fibromyalgia medications and poorly tolerated them, and he increased her methotrexate dosage to see if it would improve her psoriasis. AR 827.

In late February and early March, Katzenmeier canceled appointments in Omaha, about an hour and a half away from where she lived, because she was not feeling well. AR 966. Later in March, she reported suffering severe hand pain to Dr. Crawford, her psychologist. AR 885. She stated paperwork, cleaning, laundry, and showering had all become difficult, and she noted they had to hire a housekeeper. *Id*. She continued to complain of a fibromyalgia flare and pain in her hands at appointments with Dr. Crawford and Dr. Wisco in April and May 2018. AR 882, 884, 968. Dr. Wisco increased Katzenmeier's methotrexate dosage at her request, noting she believed she was having a lot of joint pain. AR 968. Dr. Wisco's treatment record suggests he believed

16

fibromyalgia, rather than psoriatic arthritis, was the source of her pain, and he noted the increase in methotrexate might not have any effect on "some of her problems." *Id.*

The treatment records as a whole reflect that Katzenmeier consistently complained of hand pain—at both appointments to treat the pain, like with Dr. Wisco, and at unrelated appointments. She tried numerous medications to try to improve her pain, including ibuprofen, Lyrica, Cymbalta, gabapentin, sulindac, prednisone, and diclofenac, as well as a very serious chemotherapy drug, methotrexate. She stopped engaging in substantial gainful activity (reducing her course load from two classes to one) due to difficulties typing from her pain. And although she was able to travel to Chicago for a baseball game and go on a family vacation to Canada, the treatment records reflect she often complained of pain flares that made it difficult for her to perform chores or other activities of daily living, so much so that she hired a housekeeper, and her husband installed a wrench on the front door handle so that she could open the door with her elbow and avoid using her hands. AR 51, 55-56, 897-98, 979, 1043. She also told a mental-health professional that she was looking for something to help her grip the steering wheel and that she had started using a grocery service. AR 972, 979

The record does not support that Katzenmeier could perform work that would require her to use her hands and fingers two-thirds of a workday, day in and day out. The ALJ did not give a good reason for discrediting Katzenmeier's subjective complaints related to hand pain, especially given her fibromyalgia diagnosis. On remand, the ALJ should further limit Katzenmeier's RFC with respect to her ability to handle and finger. This will likely require a new hearing with new vocational expert testimony to determine whether jobs exist Katzenmeier can perform with additional limitations.

### E. *Appointments Clause Challenge*

Katzenmeier argues that the ALJ's appointment to that position violates the Appointments Clause of the United States Constitution. The Eighth Circuit recently ruled that a Social Security claimant forfeits an Appointments Clause challenge by failing to

17

Case 5:19-cv-04076-KEM   Document 19   Filed 03/31/21   Page 17 of 20

raise it before the Social Security Administration. *Davis v. Saul*, 963 F.3d 790, 794-95 (8th Cir. 2020), *cert. granted*, No. 20-105 (U.S. Nov. 9, 2020). Because Katzenmeier did not challenge the constitutionality of the ALJ's appointment at any point during the administrative proceedings, I find that Katzenmeier forfeited her Appointments Clause challenge. This finding does not preclude Katzenmeier from raising this argument anew with respect to any ALJ assigned to hear her case on remand.

### III.    MOTION TO REMAND

After the parties filed the briefs in this case, Katzenmeier moved to remand based on new evidence. Doc. 16. She had filed a new application for DI benefits, which was granted on initial review in March 2020 based on an onset date one day after the ALJ's decision in this case. *See* Doc. 17-1. She points to this new disability determination as new evidence, which includes new opinions by the state agency consultants: the state agency psychological consultants found she could "perform simple and detailed tasks not requiring intense concentration or extensive contact with others," which is consistent with the ALJ's findings here; but the state agency medical consultants found her more physically limited than the ALJ, limiting her to sedentary rather than light work (they did not limit her vision, handling, or fingering any more than the ALJ here, however). *See id.* at 4-8. As the Commissioner notes, the new state agency consultants' opinions do not differ from the ALJ's opinion here on any of the issues originally raised by Katzenmeier in this appeal.

Katzenmeier also points to a medical opinion by Dr. Crawford as "new evidence." The opinion is dated June 11, 2018, prior to the ALJ's issuance of the opinion in this case. *See* Doc. 17-2. Katzenmeier contends that the letter "had previously been submitted to the agency," but "the agency . . . apparently lost the letter and the ALJ was not aware of the letter while determining [Katzenmeier's] claim." Doc. 17 at 4. The Commissioner disputes that Katzenmeier submitted the letter from Dr. Crawford, noting that at the hearing, Katzenmeier's counsel noted that the letter "may have been

18

submitted," but she did not see it in the record, and she requested more time to ensure that the record was complete. AR 35-36. The ALJ left the record open for ten days at counsel's request, but the letter was not submitted. AR 37.

I have already decided to remand the case based on the initial briefs. There are two types of remands in Social Security appeals: sentence-four remands and sentence-six remands. **Buckner v. Apfel**, 213 F.3d 1006, 1010 (8th Cir. 2000). Sentence-four remands, based on the fourth sentence of 42 U.S.C. § 405(g), "authorize[] a court to enter 'a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing.'" *Id.* (quoting **42 U.S.C. § 405(g)**). Sentence six of that statute, on the other hand, authorizes remands "where new and material evidence is adduced that was for good cause not presented during the administrative proceedings." *Id.* Thus, Katzenmeier's motion to remand seeks remand under sentence six of § 405(g); and I have already determined remand is appropriate under sentence four of § 405(g).

District courts in the Eighth Circuit have denied motions to remand under sentence six as moot when the court has already determined remand under sentence four appropriate. *See* **Camacho v. Saul**, No. CV 19-5126, 2019 WL 5727642, at *1 (W.D. Ark. Nov. 5, 2019) (granting "Commissioner's unopposed motion to remand . . . pursuant to 'sentence four'" and denying as moot claimant's motion to "remand for consideration of new and material evidence"); **Young v. Shalala**, No. 94-3011-CV-S-5, 1995 WL 904826, at *1 (W.D. Mo. May 31, 1995) (remanding under sentence four and denying as moot motion to remand under sentence six); *see also* **Borman v. Comm'r of Soc. Sec.**, No. 2:12-cv-509, 2013 WL 3935028, at *1 (S.D. Ohio July 30, 2013) (same). In *Brown v. Colvin*, No. 1:13-CV-01242-cgc, 2017 WL 634710, at *7 (W.D. Tenn. Feb. 16, 2017), the court recognized some authority for a "dual basis remand." But the court noted "other courts have found it to be more appropriate to order a Sentence Four remand only and to relinquish jurisdiction but order that the ALJ consider additional evidence upon remand." *Id.* (collecting cases). The court noted the latter course of action

19

"particularly preferable if the 'new sentence six material . . . is almost inseparably connected to the basis of the sentence four remand.'" *Id.*

Here, I have held remand under sentence four is required based on the lack of substantial evidence supporting the ALJ's finding that Katzenmeier could frequently handle and finger. The new evidence relied upon by Katzenmeier does not bear on this issue. Nevertheless, I note guidance from the Social Security Administration provides that upon remand from the court, the Appeals Council "generally vacates the entire [ALJ] decision" and directs the ALJ "consider all pertinent issues de novo," deciding "the remanded issues through the date of the new hearing decision." HALLEX I-2-8-18, *available at* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-8-18.html. Thus, it appears that Katzenmeier will be able to submit new evidence on remand under sentence four.

The motion to remand under sentence six is thus **denied as moot**. Doc. 16.

## IV. CONCLUSION

I **reverse** the Commissioner's decision and remand to the Social Security Administration for further proceedings. The clerk of court is directed to enter judgment in favor of Katzenmeier.

Katzenmeier's motion to remand (Doc. 16) based on new evidence is **denied as moot**.

**IT IS SO ORDRED** this 31st day of March, 2021.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa